# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | | |
|---|---|---|
| REACH AIR MEDICAL SERVICES LLC, | § § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO._____ |
| KAISER FOUNDATION HEALTH PLAN INC. and C2C INNOVATIVE SOLUTIONS, INC., | § § § | |
| Defendants. | | |

## ORIGINAL COMPLAINT

Plaintiff REACH Air Medical Services LLC ("REACH") files this Original Complaint against Defendants Kaiser Foundation Health Plan Inc. ("Kaiser") and C2C Innovative Solutions, Inc. ("C2C") and would respectfully show the Court as follows:

## INTRODUCTION

1.    REACH files this case to vacate an Independent Dispute Resolution ("IDR") arbitration award made by federal contractor C2C pursuant to the No Surprises Act ("NSA"), which selected Kaiser's purported Qualifying Payment Amount ("QPA") as the appropriate out-of-network payment for a 80-mile air ambulance transport.  The award was secured through undue means

and misrepresentations on Kaiser's part and by application of a standard that violates federal law by C2C.

2.     The NSA took effect on January 1, 2022.  It is implemented and enforced by the combined efforts of the U.S. Departments of Labor, Health and Human Services, and the Treasury (the "Departments"), which together issued interim and then final rules to create an unprecedented, mandatory federal arbitration process to determine pricing for all out-of-network ("OON") emergency air ambulance transports of patients who are covered by commercial insurance.   As part of that federal arbitration process, the Departments created a list of only eleven approved IDR entities (one of which is no longer accepting new disputes).[1]   There is virtually no information available to the parties to evaluate the competency or quality of the various entities.   If the parties to the proceeding do not agree on which IDR entity to use, the Departments appoint one for them.   Under the NSA, the IDR entity's decision is binding on the parties unless there has been a misrepresentation of fact to the IDR entity or it meets the requirements to be vacated under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 10(a).

3.     On February 7, 2022, an emergency air transport was requested from Santa Rosa, California to Redwood City, California.  REACH answered

---

[1] https://www.cms.gov/nosurprises/help-resolve-payment-disputes/certified-idre-list

the call, flying the patient on a helicopter that was specially configured for medical transport and providing continuous medical care by a crew of specially trained medical professionals throughout the 80-mile trip.  The emergent nature and medical necessity of the transport were never at issue – only the price to be paid for the transport.

4.     The patient was insured through Kaiser, with which REACH is OON.  Kaiser paid REACH  $24,813.48 for the transport, representing to REACH that the amount "allowed" on its Explanation of Benefits ("EOB") for the claim was its QPA.

5.     When REACH and Kaiser failed to agree on the selection of an arbitrator, the Departments assigned C2C to them.  Kaiser then implemented a bad faith scheme to minimize further payment on the claim.  In particular, it submitted to C2C a different, lower amount that it claimed was its QPA. Kaiser next concealed from REACH in the IDR process the details on how the purported QPA listed on the EOB was calculated.  And it never disclosed to REACH the second, lower QPA it submitted to C2C.  The result was that C2C was misled into believing that Kaiser had offered to pay more than its QPA and REACH was duped into basing its offer and submitting briefing based on a higher QPA than the one Kaiser submitted to C2C.  An anonymous person at C2C then reviewed the parties' submissions and applied an illegal presumption in favor of the purported QPA, thereby violating the NSA and

rewarding Kaiser for its bad faith scheme and multiple violations of federal law.

6.   REACH hereby seeks to vacate the award and requests the Court to enter an order directing a rehearing with due process protections.

## PARTIES

7.   Plaintiff REACH Air Medical Services LLC is a California corporation with its principal place of business in California.  REACH provides air ambulance services in states around the country.

8.   Defendant Kaiser is a California corporation with a principal place of business in Oakland, California. Kaiser is a health maintenance organization providing prepaid comprehensive medical, surgical and hospital services to voluntarily enrolled members.  Kaiser provides coverage for emergencies in Florida, thereby properly subjecting it to suit there. *See Miami Children's Hospital, Inc. v. Kaiser Foundation Health Plan, Inc.*, 2009 WL 1532125 at *3 (S.D. Fl. 2009).   Upon information and belief, Kaiser also regularly selects C2C, located in Jacksonville, to adjudicate its provider disputes pursuant to the NSA.  Kaiser also made misrepresentations and material omissions in Kaiser's submissions to C2C in Jacksonville, Florida which damaged REACH.

9.   Defendant C2C is a Texas corporation with its principal place of business in Jacksonville, Florida.

## VENUE AND JURISDICTION

10.     The NSA creates a right to judicial review of awards issued in IDR proceedings.  *See* 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II).  Venue is proper under 28 U.S.C. § 1391(b) because both defendants reside in Florida and at least one resides in this judicial district.  It is also the district in which the award was made.  9 U.S.C. § 10(a).

11.     This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C § 1331, the NSA and its implementing regulations, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2201, because this matter requires the Court to interpret and apply the NSA and its implementing regulations, and because 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II) expressly authorizes judicial review under the circumstances at issue herein.

## FACTUAL BACKGROUND

12.     The air ambulance industry plays an integral role in the American healthcare system.  Air ambulances often serve as the only lifeline, particularly in rural areas, connecting critically ill and injured patients to healthcare. They transport trauma, stroke, heart attack, and burn patients and other emergent cases requiring critical care.  Without air ambulances, more than 85 million Americans would not be able to reach a Level 1 or 2 trauma center within an hour when emergency care is needed.

13.    The delivery of on-demand, life-saving air ambulance services in emergencies requires substantial investments in specialized aircraft, air bases, technology,  personnel, and regulatory compliance systems.

14.    On February 7, 2022, REACH provided critical emergency air transport from a Kaiser Permanente hospital in Santa Rosa, California to another Kaiser Permanente hospital in Redwood City, California.  The patient in question was diagnosed with a cerebral aneurysm and needed immediate, specialized care.  REACH answered the call, transporting the patient on an airplane and providing continuous medical care throughout the 80-mile trip.

**The No Surprises Act and Federal Independent Dispute Resolution Proceedings.**

15.    [Duplicative of paragraph 2]There are sections of the NSA that are unique to air ambulance transports because air ambulance transports are covered by the Airline Deregulation Act and are not subject to state rate regulation.  Broadly speaking, the NSA requires patient cost-sharing for emergency OON claims to be the same as for in-network claims.  That said, insurers are allowed to initially pay to the OON provider whatever amount they deem appropriate (or nothing at all).  If they make an OON payment that is too low, a provider must first attempt to negotiate a higher one.  If negotiations fail, a provider must submit the dispute to the IDR process.  During this process, the IDR entity (a federal contractor), without a hearing,

must select one of the two offers submitted based on the position statements submitted by the parties.

16.    The Departments created a list of only eleven approved IDR arbitration entities (one of which is no longer accepting new disputes).  There is no meaningful information available to the parties to evaluate the competency or quality of the various IDR entities.  No information is provided about the specific qualifications of the employees of the IDR entities who will actually decide the appropriate OON rate for a transport.  If the parties to the arbitration do not agree on an IDR entity to use, the Departments appoint one for them.

17.    C2C is a medical appeals company headquartered in Jacksonville, Florida.  Its primary business is providing second level Medicare appeals or reconsiderations for Medicare Parts A and B.  It also performs reconsiderations of adverse determinations and redeterminations for covered drug benefits under Medicare Part D.  In 2022, it began accepting IDR disputes between payors and providers under the NSA.

18.    C2C currently charges $349 per IDR dispute.  This is the amount it receives no matter how much, or how little, time it spends on the dispute. The statute contains no requirements for what the person actually deciding the dispute is paid or the amount of time that must be spent reviewing the submissions or weighing the evidence.  The person at C2C who actually

reviews the position statements and renders the award is not required to disclose his or her identity or qualifications. The award is made without a hearing or exchange of written submissions between the parties. Accordingly, neither party is allowed the opportunity to respond to the other's submission. The way the Departments have implemented the No Surprises Act results in a black box approach where decisions can be made without rhyme or reason. Judicial review of IDR proceedings is therefore essential to ensure that providers like REACH receive due process and are not subject to bad faith schemes and unlawful decision making.

19.     REACH and its affiliates have prevailed in a substantial majority of the disputes decided through the IDR process. Many of the reasoned awards they have received explain how the credible evidence submitted supports the OON payment requested.

20.     To date, REACH and its affiliates have lost every dispute the Departments have submitted to C2C, which does not provide reasoned awards but rather selects the payment offer that is closest to the QPA, an amount that is supposed to represent a payor's median rate for contracted in-network services. Unsurprisingly, this is always the payor's offer.

21.     The NSA requires arbitrators to consider certain categories of information in determining the appropriate OON rate. *See* 42 U.S.C. § 300gg-

112(b)(5)(C) (Considerations in determination).[2]  The QPA is only one such piece of information.  *Id.* at § 300gg-112(b)(5)(C)(i).  The QPA is defined in the NSA as the "median of the contracted rates recognized by the plan or issuer" "for the same or a similar item or service" offered in the same insurance market and in the same geographic region as of January 31, 2019, , increased by the consumer price index.  *Id.* at § 300gg-111(a)(3)(E)(i).  By regulation, a health plan can calculate its QPA using only rates it has "contractually agreed to pay a . . . provider of air ambulance services for covered items or services," expressly excluding any "single case agreement, letter of agreement, or other similar arrangement . . . for a specific participant or beneficiary in unique circumstances" as "not constitu[ting] a contract."  45 C.F.R 149.140(a)(1).[3]  If a plan or issuer does not have at least three in-network contracts for a service, the QPA may be determined based on information from a third-party database. *Id.* § 149.140(c)(3)(i).

22.  The NSA enumerates additional information that must be considered:

---

[2] The No Surprises Act amended the Internal Revenue Code, the Employee Retirement Income Security Act (ERISA), and the Public Health Service Act (PHS Act).  All three statutory amendments are substantively identical.  Accordingly, for sake of brevity, citations to NSA requirements are to the PHS Act, 42 U.S.C. 300gg et seq.).

[3]  The regulations regarding how the QPA may be calculated are currently being litigated by the air ambulance industry.  *See, e.g., Assoc. of Air Medical Servs. v. U.S. Dept. of Health and Human Servs. et al.*, Case No. 1:21-cv-3031 in the United States District Court for the District of Columbia (filed 11/16/21).

- the quality and outcomes measurements of the provider that furnished the services;

- the acuity of the individual receiving the services or the complexity of furnishing such services to such individual;

- the training, experience, and quality of the medical personnel that furnished the services;

- ambulance vehicle type, including the clinical capability level of such vehicle;

- population density of the pick up location (such as urban, suburban, rural, or frontier); and

- demonstrations of good faith efforts (or lack of good faith efforts) made by the nonparticipating provider or the plan or issuer to enter into network agreements and, if applicable, contracted rates between the provider and the plan or issuer, as applicable, during the previous 4 plan years.

42 U.S.C. § 300gg-112(b)(5)(C)(ii). Furthermore, the IDR entity must consider any further information related to an offer and submitted by a party. *Id.* at § 300gg-112(b)(5)(B)(ii).

**The Illegal Presumption in Favor of the QPA.**

23. The Departments originally jointly published an Interim Rule that compelled IDR entities to apply a rebuttable presumption that the QPA was the appropriate OON rate. Arbitrators were required to select the offer closest to the QPA unless a provider overcame the presumption with credible evidence.

This "thumb on the scale" approach was held illegal in litigation filed by the Texas Medical Association ("TMA") on behalf of physicians and facilities.  *See Tex. Med. Ass'n v. United States Dep't of Health & Human Servs.*, No. 6:21-cv-425-JDK, 2022 WL 542879 at *15 (E.D. Tex. Feb. 23, 2022).  Subsequently, in a related lawsuit, the same federal court invalidated the Departments' illegal presumption as it applied to air ambulance transports.  *See Lifenet Inc. v. U.S. Dept. of Health & Human Servs., et al.*, No. 6:22-cv-00162-JDK, 2022 WL 2959715 at *10 (E.D. Tex., June 26, 2022) (vacating final sentence of 45 C.F.R. § 149.520(b)(2) requiring additional information submitted by parties "demonstrate that the qualifying payment amount is materially different from the appropriate out-of-network rate").

24.     The claim at issue herein was decided on September 12, 2022, more than two months after the illegal presumption in favor of the QPA was invalidated.  Accordingly, C2C was required to consider all of the facts and circumstances of the payment dispute and select the offer that best represented the value of the air ambulance services provided to Kaiser's member.  The QPA was merely one data point, and should have had little relevance to this analysis, especially if Kaiser failed to provide any evidence to show how its QPA was calculated or how it specifically related to the transport at issue.[4]

---

[4] For example, QPAs may be based on contracts with air ambulance companies that could not possibly have performed the transport under consideration.  Similarly QPAs based on

25.     The Final Rule, issued after the IDR decision at issue herein was made, did not adopt the QPA presumption from the Interim Rule.  The Final Rule states that "IDR entities should select the offer that best represents the value of the item or service under dispute after considering the QPA and all permissible information submitted by the parties." 87 Fed. Reg. 52,618 (August 26, 2022) at 52,628.

**Kaiser Represents that REACH was Paid the QPA.**

26.     By regulation, insurers are required to include with each initial payment or denial the insurer's QPA for each item or service involved.  *See* 45 C.F.R. § 149.140(d)(1)(i).   Insurers must also certify that each QPA was determined in compliance with federal requirements.  *Id.* § 149.140(d)(1)(ii)(A)-(B).  As the Departments have explained:

> The Departments seek to ensure ***transparent and meaningful disclosure*** about the calculation of the QPA while minimizing administrative burdens on plans and issuers. These interim final rules therefore ***require that plans and issuers make certain disclosures with each initial payment*** or notice of denial of payment, and that plans and issuers ***must provide additional information upon request*** of the provider or facility.

86 Fed. Reg. 36,898 (July 13, 2021) (emphasis added).

27.     Kaiser was also required by regulation to "provide a statement that if the provider or facility, as applicable, wishes to initiate a 30-day open

_____

agreements with small, urban fleets owned and operated by a hospital bear little relevance to the appropriate rate for a rural transport by an independent air ambulance company that has invested in the bases, fleet and infrastructure needed to perform such transports.

negotiation period for purposes of determining the amount of total payment, the provider or facility may contact the appropriate person or office to initiate open negotiation, and that if the 30-day open negotiation period does not result in a determination, generally, the provider or facility may initiate the IDR process within 4 days after the end of the open negotiation period." 45 C.F.R. § 149.140(d)(1)(iii). Kaiser was further required to "provide contact information, including a telephone number and email address, for the appropriate office or person to initiate open negotiations for purposes of determining an amount of payment (including cost sharing) for such item or service." *Id.*

28.    On April 21, 2022, Kaiser issued an EOB for the California transport. It "allowed" $24,813.48 and paid the claim accordingly (minus a $250.00 copay). The charges were coded as "claim paid at allowed amount." There was no explanation of why/how the amount was selected. Kaiser represented to REACH that the amount allowed was its QPA for the claim.

29.    Because the purported QPA was far below reasonable market rates, REACH initiated the Open Negotiation Period. Rather than negotiate a reasonable OON rate as contemplated by the NSA, Kaiser adopted a "take-it-or-leave-it" approach. During the ONP, Kaiser refused to provide additional information regarding its alleged QPA calculation in response to questions from REACH.

**Kaiser Submits a Different QPA to C2C, Which Applied the Illegal Presumption In Kaiser's Favor.**

30.   Kaiser next proceeded to submit a ***different***, even lower QPA to C2C.  Kaiser claimed the QPA for the transport at issue was $10,276.29 for the base rate and $7,028.00 for mileage, a total of $17,304.29.  Kaiser now claimed two QPAs for the exact same transport.

31.   Certain payors are not properly calculating the QPA in accordance with the regulations, a fact the Departments have acknowledged.  For instance, the Departments concede that payors are not properly calculating QPAs for providers in the "same or similar specialty."  DEP'TS, *FAQs about Affordable Care Act and Consolidated Appropriations Act, 2021*, Implementation Part 55 at pp. 16-17 (Aug. 19, 2022) available at https://perma.cc/B7L7-QEKM.  They also concede that payors sometimes calculate the QPA by including contracts that have $0 listed for a service, thereby artificially depressing the QPA.  The Departments have stated that this practice is improper.  *Id.* at 17 n.29.

32.   Both of Kaiser's purported QPAs (the one from the EOB and the one submitted to C2C) diverge significantly from California market data for similar services from 2019.  Kaiser's purported QPAs are approximately ***one-third*** of the average OON rate for helicopter air ambulance trips in California based on 2019 allowables.

33.    This is not the first time Kaiser came up with a scheme to underpay providers.   Prior to 2020, Kaiser was paying fair rates for air ambulance transports in California.   Then, California passed a law prohibiting air ambulances from balance billing patients for amounts not paid by their insurers.   In response, Kaiser unilaterally slashed payments overnight by approximately 60%.

34.    Below is the sum total of the reasoning provided by C2C in selecting the QPA as the appropriate payment for the flight at issue:

> The IDRE has received offers from both parties. The QPA in this instance for code A0431 was $10,276.29 and the QPA was $7,028.00 for code A0436. The final offer submitted by [REACH] was $29,554.60 for code A0431, which is 288 percentage of the QPA and for code A0436 was $22,920.00, which is 326 percentage of the QPA. The final offer by [Kaiser] for code A0431 was $16,781.48, which is ***163 percentage of the QPA*** and for code A0436 was $8,032.00, which is ***114 percentage of the QPA***. It is noted that rotary wing wait time (A0420) was included in both offers; however, the non-initiating party's offer was $0.00 due to the procedure code not being covered per the explanation of benefits (EOB). Therefore, this code was not reviewed.
>
> As noted above, the IDRE must consider related and credible information submitted by the parties to determine the appropriate OON rate. As set forth in regulation, additional credible information related to certain circumstances was submitted by both parties. ***However, the information submitted did not support the allowance of payment at a higher OON rate.***

As explained above, Kaiser's offer on the claim was the amount it represented to REACH was its QPA.  By submitting a lower QPA to C2C, Kaiser misled C2C into believing it was offering an amount  higher than its QPA.  C2C

- 15 -

reviewed this amount and then applied an illegal presumption in favor of the QPA, selecting the offer closest to the QPA and requiring REACH to prove that "a higher OON rate" than the QPA was warranted.   Naturally, this resulted in a decision in favor of Kaiser.

35.    Kaiser has developed a scheme to minimize payments on air ambulance transports by misrepresenting the amount of its QPA to providers and IDR entities.   Kaiser furthers the scheme by concealing information essential to understanding what its QPA actually is and how it was calculated. This is all done so no one can question Kaiser's QPA methodology, which results in two different QPAs, each of which wildly differs from market rates. Kaiser is securing IDR awards through undue means.

## KAISER'S AWARD SHOULD BE VACATED AND THE DISPUTE RESUBMITTED FOR A NEW IDR DETERMINATION

36.    The NSA allows a district court to vacate an arbitration award in the following four circumstances:

(1)    where the award was procured by corruption, fraud, or undue means;

(2)    where there was evident partiality or corruption in the arbitrators, or either of them;

(3)    where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4)     where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

42 U.S.C. § 300gg–111 (c)(5)(E)(1) (adopting the standards found at 9 U.S.C. § 10(a)(1)).  In addition, an IDR decision is not binding on a party where there is evidence of misrepresentation of facts presented to an IDR entity regarding the claim, such as an improperly calculated QPA.  *Id.*  The IDR award in favor of Kaiser should be vacated under all five of these grounds.

37.    Kaiser secured the award through undue means and misrepresentations of fact.  It created two QPAs, submitting the lower one to the IDR entity to create the false impression that it was offering to pay more than its QPA.  It claimed a higher QPA to REACH, resulting in REACH submitting its IDR brief under false pretenses.  Upon information and belief, neither of the QPAs were calculated in accordance with federal law.  These actions were taken in bad faith and to secure an undue advantage in the IDR process.

38.    Also, C2C revealed evident partiality, committed prejudicial misbehavior, and exceeded its powers by using an illegal presumption in favor of the undisclosed QPA.  As demonstrated by C2C's short award, Kaiser's payment offer prevailed solely because it was the closest to the QPA.  An anonymous person at C2C calculated the offers as a percentage of the QPA, selected the one closest to the QPA, and stated that the submitted information

"did not support the allowance of a payment at a higher OON rate." Such a presumption in favor of the QPA is precisely what federal law prohibits.

39.    The FAA permits this Court not only to vacate an award but to "direct a rehearing by the arbitrators" so long as the parties' agreement does not preclude it.  9 U.S.C. § 10(b).  Here, there is no agreement between the parties and thus nothing precluding a rehearing.  Furthermore, nothing in the NSA prevents a court from providing appropriate relief such as a rehearing when it vacates an IDR award.  Merely vacating the IDR award without directing a rehearing in accordance with the proper standards under the NSA would provide REACH no relief at all, as only a rehearing can result in a higher payment under the new federal regulatory scheme created by the NSA.

40.    This case raises substantial issues of federal law relating to how the QPA may be permissibly calculated under the NSA and its implementing regulations, the proper interpretation of the NSA with respect to what constitutes a misrepresentation of fact to an IDR entity, the proper interpretation of the NSA with respect to whether IDR awards are enforceable where such misrepresentations of fact have occurred, and the proper remedy under the NSA and its implementing regulations where a payor has withheld material information from a provider.  It also concerns the due process requirements for review of decisions made by IDR entities, including the relationship between the NSA, which created a compelled process

administered by a governmental agency, and the FAA, which governs voluntary agreements made between private parties.

41.     In particular, IDR proceedings are unlike private arbitrations. REACH did not voluntarily agree to arbitrate its payment dispute.  It is required by federal law to participate in IDR proceedings in order to try to obtain fair compensation for its services.  The Departments assigned their preferred Medicare review company, C2C, to this dispute.  Unlike the traditional "rank and strike" procedure used by arbitration services such as the American Arbitration Association, REACH did not select and had no input in selecting the arbitrator (C2C) or the individual who actually decided the dispute, who remains anonymous to this day.  And unlike private arbitrations, REACH  was not provided any discovery and did not receive a reasoned award. Indeed, the award makes no mention of the specific, credible evidence submitted by REACH in support of a higher payment.

42.     Due process requires more.   REACH provided a life-saving transport and is entitled to a fair adjudication of the amount of its payment.

## REQUEST FOR RELIEF

43.     REACH requests that the Court vacate the arbitration award at issue and declare that: 1) Kaiser made a misrepresentation of fact to C2C when it submitted what it represented was its QPA for the claim; 2) Kaiser procured the IDR award at issue through misrepresentations and undue means; and 3)

by applying an illegal presumption in favors of the QPA, C2C revealed evident partiality, committed prejudicial misbehavior, and exceeded its powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

44.    REACH further requests that the Court direct C2C to rehear this claim, to implement a new briefing schedule so that REACH can submit a new position statement and new offer, and to assure that REACH receives due process by rendering a reasoned decision in accordance with the requirements of the NSA, upon consideration of all evidence submitted by the parties that relates to an offer, and without a presumption in favor of the QPA.

45.    REACH further requests its attorney's fees and costs, and any other just and proper relief.


[Signatures on Next Page]

Dated:  October 26, 2022

SMITH HULSEY & BUSEY

NORTON ROSE FULBRIGHT US LLP

By: *s/ Lanny Russell*
     Lanny Russell

*/s/ Adam T. Schramek*
Adam T. Schramek, Lead Counsel

Florida Bar No. 303097
One Independent Drive, Suite 3300
Jacksonville, Florida 32202
(904) 359-7700
(904) 359-7708 (facsimile)
lrussell@smithhulsey.com

Texas Bar No. 24033045
98 San Jacinto Boulevard
Suite 1100
Austin, TX  78701-4255
Telephone:  (512) 474-5201
Facsimile:   (512) 536-4598
adam.schramek@nortonrosefulbright.com
*Pro Hac Vice Pending*

Abraham Chang
Texas Bar No. 24102827
1301 McKinney, Suite 5100
Houston, TX  77010-3095
Telephone: (713) 651-5151
Facsimile:  (713) 651-5246
abraham.chang@nortonrosefulbright.com
*Pro Hac Vice Pending*

*Attorneys for REACH Air Medical Services LLC*

01176906.DOCX